Eva MADDEN, Sharon E. Dooley and
Michael G. Madden, Petitioners,

v.

Donald E. PHELPS, Administrator of the
Estate of Albert A. Madden and Sarah
R. Madden, Respondents.

Civil Action No. 1055–K.

Court of Chancery of Delaware,
Kent County.

Submitted: June 26, 1995.
Decided: Sept. 1, 1995.

Paul E. Bilodeau, of Hudson, Jones, Jay-
work, Williams & Liguori, Dover, for Peti-
tioners.

Noel E. Primos, of Schmittinger & Rodri-
guez, P.A., Dover, for Respondent.

ALLEN, Chancellor.

Plaintiffs Eva Madden, Sharon E. Dooley,
and Michael G. Madden are respectively the
wife and two adult children of Albert Madden
who died on December 11, 1992, a resident of
Kent County, Delaware. Plaintiffs filed this
action against Donald E. Phelps, the succes-
sor administrator of the Estate of Albert H.
Madden, to recover their rightful inheritance
which was distributed to Sarah Madden, the
widowed mother of decedent. It is now
agreed that Sarah Madden was not entitled
to the estate as Albert's heir. It is assumed
for these purposes that the administrator
acted in good faith when he distributed the
bulk of the estate to Sarah, believing her to
be the sole heir.[1]

The parties agreed on the relevant facts.[2]
After hearing argument the Master in Chan-
cery, to whom the matter was referred, rec-
ommended the granting of the petition. De-
fendant has filed exceptions to the Master's
Report. *See* Rule 135 *et seq.* of Rules of the
Court of Chancery.

The facts stipulated raise as a first
issue the question: what liability standard
governs the duty of an executor or adminis-
trator to an heir or devisee when the admin-
istrator is unable to distribute the heir's enti-
tlement to her because he has distributed the

---

1. Defendant states that Sarah Madden told him
that she had given these funds to her son to hold
for her. Defendant concedes in his brief that a
report of such statements constitutes inadmissi-
ble hearsay. Equally noteworthy is the fact that
no reference to Sarah as a possible creditor or
trust beneficiary was noted on the Administra-
tor's First and Final Accounting as found in the
Register of Wills file. There Mrs. Madden is
noted only as the sole heir of decedent.

2. *See* letter of June 26, 1995 of counsel to court.

estate to a person or persons not entitled to it. This question does not appear to have been previously addressed in this jurisdiction. Logically there are at least three possibilities:

*First,* it may be that liability turns on intention; that is so long as the administer acts in good faith, there is no liability; *Second,* liability may turn on the presence or absence of due care;

*Third,* liability may be strict; that is, unless the administrator obtains a judicial order of distribution, any delivery of estate property to one not entitled thereto, occasions liability to any person injured thereby. In this event administrators would in effect be forced to demand a surety bond from persons to whom distribution is made.

Each of these rules offers advantages and costs.[3] None are precluded or expressly mandated by the Delaware statutes or their history. The decided cases in other jurisdictions offer helpful guidance, however. For the reasons that follow I conclude that the Delaware law renders an administrator who misdelivers estate property prior to the expiration of the period in which creditors may make their claims and a final accounting is judicially accepted, strictly liable to an heir or devisee injured thereby; but after that period has passed and a final accounting has been signed by the court, misdelivery by an administrator will give rise to liability only if it represents a failure to exercise that degree of care that a fiduciary would exercise before distributing the corpus of a trust or the body of an estate. In rejecting the notion that a strict liability standard govern, at all times, I recognize that that standard would impose a bonding cost on most estates (in a surety market that may not be very efficiently priced) in order to cover what the reported cases show to be a very rare event. After a final accounting has been accepted, the intermediate negligence standard offers adequate

protection to the property rights of unknown heirs, without imposing this cost. This standard is suggested by the authorities discussed below.

■ I conclude that the Master was clearly correct as a matter of law that the defendant in paying out the estate almost immediately upon his appointment, without doing any significant investigation to uncover any previous marriage or of the children born of that marriage, plainly did not meet the standard that the law demands of fiduciaries. More basically, however, I hold that since the Administrator did distribute the estate before expiration of the creditor claim period[4] and the judicial acceptance of the final accounting, he is subject to strict liability for the misdelivery of these funds to those who were thereby deprived of their inheritance.

## I.

Albert A. Madden died intestate on December 11, 1992. Walter Harvey, a friend, initially opened the estate, but died on February 9, 1993, before the administration of the estate could be completed, Donald E. Phelps (also a friend of Albert Madden) succeeded Mr. Harvey as administrator on February 16, 1993.

The inventory shows the assets of the estate totaled $60,212. On or about March 3, 1993, without obtaining a decree of distribution from the court and before the time for presentment of claims by creditors had expired, Mr. Phelps distributed to Sarah Madden, $50,000 of the $53,884 that was then available for distribution. In doing so, defendant relied upon Sarah Madden's representations that she was the sole heir of Albert Madden and upon a "special power of attorney" executed by her two weeks after her son's death which appointed Mr. Harvey her attorney-in-fact for the purpose of taking possession of and receiving assets of Albert Madden. (*See* Fn. 1) The special power of

---

3. I need not address the related question of the liability standard to *creditors* when an executor or administrator has chosen to distribute property before the expiration of the period for filing creditor claims. *See, e.g., State v. United States Fidelity & Guaranty Co.,* Del.Super., 36 Del. 242, 173 A. 529 (1934) (strict liability).

4. 12 *Del.C.* § 2102. Creditors' claims must be presented within eight months of decedent's death.

attorney states that Sarah Madden was the mother of Albert Madden "and his sole heir in that he was not survived by a spouse, any issue, any siblings, and that his father is deceased." Mr. Phelps review of other records in Albert Madden's possession at the time of his death gave him no reason to question Sarah Madden's representations.

It is now undisputed that Sarah Madden was neither her son's sole survivor nor his next of kin for purposes of the intestate laws. In fact, Albert Madden had married Eva M. Sayres (petitioner Eva Madden) on January 14, 1957, and had two children with her; Sharon Madden Dooley (born on October 28, 1957) and Gary Michael Madden (born on July 17, 1961). Eva Madden asserts that she was never divorced from Albert Madden and the public records reveal no evidence that they were divorced. Thus, in accordance with Delaware intestacy law, Eva and the two children are entitled to the entire estate. 12 Del.C. §§ 502, 503. Even if Albert and Eva were divorced prior to Albert's death, Albert's children would be entitled to the entire estate rather than Sarah Madden. See 12 Del.C. § 503.

On June 16, 1993, Mr. Phelps and the Register of Wills were advised of the existence of Eva Madden and her children by their attorney. The present action was commenced in April 1994 by Eva and her children to recover their rightful inheritance from Mr. Phelps and from Sarah Madden. After this suit was filed, however, it was discovered that Sarah Madden had died on February 28, 1994. Although recovery of the mistaken distribution should rightfully be made first against Sarah Madden, the whereabouts of her assets appear currently to be unknown. Thus, as a practical matter plaintiffs as rightful heirs are left only with a claim against Mr. Phelps for their inheritance.

The Master in Chancery ruled that Mr. Phelps, as administrator, did not exercise ordinary care and diligence in administering the estate—primarily because the distribution was made so long before the expiration of time for presentment of claims by creditors had expired. See Master's Report page 29. Having failed to act reasonably, the Master held Mr. Phelps liable to Eva Madden and her children for the $50,000 that he delivered to Sarah Madden. The Master also noted that Mr. Phelps has a claim over Sarah Madden's estate.

## II.

Mr. Phelps asserts that as a matter of law, an administrator cannot be held liable for actions taken in good faith.

Although Delaware law has not specifically enunciated the legal standard governing executors' liability for losses for incorrect distribution of estate assets, all jurisdictions that have considered that question appear to be in agreement that good faith of the fiduciary is not alone a valid defense to a claim for misdelivery. One conventional authority states that, "where an administrator negligently fails to ascertain the identity of heirs entitled to share the estate and as a consequence makes distribution to the wrong persons, the administrator and his surety are personally liable to the distributees legally entitled to receive the assets, even if the distribution was made in good faith and in ignorance of the existence of the person omitted, and in reliance on counsel." See 31 Am.Jur.2d Executors and Administrators § 1063 (1989) (citations omitted).

The more interesting question is whether good faith, when coupled with due care, can insulate an administrator who makes a distribution to the wrong person without first seeking a court decree of distribution. On this question the cases from other jurisdictions, when considered together, do provide a structure that recognizes a strict liability standard for mistaken distributions made early in the administration (expressed usually as those made before expiration of the period for the making of creditor claims and prior to judicial approval of the final accounting); and a negligence standard for claims arising from distributions made late in the administration without a decree of distribution.

The overwhelming authority at common law holds that when an administrator makes a "volunteer" distribution (before obtaining either a court order or a court approval of

the final account of the estate) the fiduciary does so at her own risk. *See, e.g., Shivvers v. Mueller,* 340 N.W.2d 586, 589 (Iowa 1983); *Smith v. Catterall,* 107 R.I. 729, 271 A.2d 300, 303 (1970); *In re Bennett's Estate,* 13 Cal.2d 354, 90 P.2d 84, 89 (1939); *State v. Brown,* 170 Md. 97, 183 A. 256 (Md Ct. of App.1936); *In re Carlin,* 226 Mo.App. 622, 47 S.W.2d 213, 215 (1931).[5]

Plaintiffs argue that this common law rule imposes liability on the administrator for an incorrect distribution, regardless of whether the administrator used reasonable diligence, if the administrator made the distribution without first getting a judicial decree of distribution. But a careful reading of the cases makes clear that the rule does not stretch so far. The cases do not in effect require a judicial proceeding for a decree of distribution. The volunteer distributions to which there appears in the cases to be no defense of due care involve distributions either made before the time for presentment of claims by creditors has expired or before the final account has been approved by the court—that is, prior to final settlement of the estate. This standard rule is set forth for example in 31 Am.Jur.2d Executors and Administrators § 1062 as follows:

> Notwithstanding that he may be acting in good faith, an executor or administrator who pays a legacy or distributive share before expiration of the time allowed for presentation of claims, without requiring a refunding bond, may be held responsible for a loss resulting from his action. The common-law rule is that volunteer distributions, even those made in good faith, without court order, are made at the representative's own peril (citations omitted).

According to some cases, however, an administrator does not assume the risk of (strict liability for) all incorrect distributions made without a court decree of distribution. Liability for misdelivery of estate assets after the period for presentation of creditors' claims has expired and a final accounting has been accepted, is premised on a breach of due care. For instance, in *Shepherd v. Townsend* the executrix did not seek a court decree of distribution prior to making an incorrect distribution. *Shepherd v. Townsend,* 249 Miss. 383, 162 So.2d 878 (1964). The incorrect distribution, however, was made after the court had approved the final account. In that circumstance, the Mississippi Supreme Court applied a negligence standard it described as follows: "where an executor or administrator negligently distributes the estate to the wrong persons he may be compelled to pay again to the one rightfully entitled, notwithstanding he made the distribution in good faith and in ignorance of the existence of the person omitted." *Id.* 162 So.2d at 881. While the court did not invoke the common law rule imposing a strict liability standard on volunteer distributions notably the court concluded that the administrator in that case had been negligent.

In contrast, the executors in *Shivvers v. Mueller,* 340 N.W.2d 586, 589 (Iowa 1983) made a distribution after the period of time allowed to creditors had expired, but without getting a court order approving the final account. The Iowa Supreme Court held that in circumstances a rule of strict liability obtained:

> It seems to be common practice in Iowa to make partial distributions of estate property prior to final settlement. This is often, but not always, done with court order. Plainly there is no statutory requirement for a court order before making such a voluntary distribution.... Notwithstanding the silence of the Iowa probate code on the subject, the court of appeals unquestionably stated the common law rule: volunteer distributions, even those made in good faith, without court order are made at the representative's own peril. [T]here is peril of additional tax liability [and] ... peril of making a mistake in the distribution.

These cases suggest that the standard to which an administrator is held in making

---

5. Only one case could be found where an administrator did not seek a court order first but was nevertheless held not liable for a wrongful distribution. *See In re Carpenter,* 154 Misc. 143, 276 N.Y.S. 754 (N.Y. Surrogate's Ct.1935). It is important to note, however, that the executor in that case did not distribute the estate until the expiration of the statutory period of administration (albeit without a court order). *Id.* 276 N.Y.S. at 759.

estate distributions depends on whether the distribution is made before the period for presentation of creditor claims has elapsed and the final account of the estate has been approved by the court; it is not dependent on whether a court decree of distribution was sought. Under this test an administrator is held to the standard of due care with respect to distributions, unless he chooses to distribute assets prior to the final settlement of the estate. When such voluntary distributions are made, the administrator assumes the risk of creditors' claims exceeding the remaining assets or of a mistake in the distribution.

The policy underlying this common law rule is the protection of creditors and rightful heirs from actions taken by an administrator, prior to the final settlement of the estate, that prejudice their interests. In this case, had Mr. Phelps waited to make any distribution until August 1993—the time in which creditors could present claims—he would have learned of the existence of the rightful heirs. Mr. Phelps' premature distribution prior to the termination of the period for presenting claims and prior to judicial acceptance of final settlement of the estate was done at his own peril.

Defendant asserts that such reasoning does not apply in this state, since the General Assembly has amended our statutes to remove the mandatory feature of the executor's bond with surety. He contends that this action implies that the General Assembly intended no liability for unintentional losses. This argument, however, seems to me plainly to misconstrue the purpose and effect of the amendment that made executor's bonds necessary only when ordered by the Court. That amendment represented an attempt to make administration of decedents' estates more economical by converting a mandatory expense for surety to one that would be incurred only where a party in interest could show some ground for the expense. This change does not imply a change in liability standards nor does it imply a belief as to the nature of the existing liability rule. Strict liability for losses, for example, is logically completely consistent with having surety bonds only where the expense of one is justified by circumstance.

The bifurcated framework here applied provides a considered balancing of the interests of executors as a class, of the public, which is interested in effective and efficient protection for devices used to transfer wealth and of heirs. Holding an administrator potentially liable regardless of his use of due care, even after the creditor claim period has expired and a final account accepted, would, in effect, necessitate a judicial decree of distribution in every case or the absorption of surety costs by all heirs. These costly consequences of a legal rule deserve consideration. There are, of course, valid reasons for making a partial distribution *prior* to the final settlement of the estate; such as accommodating specific economic needs of the distributees or minimizing taxes. In such cases, there are ways in which administrators can protect themselves even under the strict liability regime. Most commonly, an administrator could require security from the distributee in the form of a refunding bond. The Delaware Supreme Court has recognized that such security can be for the protection of executors. *May v. duPont*, Del.Supr., 42 Del.Ch. 570, 216 A.2d 870, 873 (1966). The cost of this form of insurance, then, would be borne by the specific distributee who had a need for a volunteer distribution, but that cost will be assumed in relatively few cases. Thus the rule adopted represents a prudent balancing of competing considerations and is consistent with the General Assembly's effort to reduce surety bond expenses incurred by all estates.