Vernon J. DUNLAP and Alice
C. Miller, Plaintiffs,

v.

THE FIRST NATIONAL BANK OF
DANVILLE and International Genealogical Search, Inc., Defendants.

No. 98–CV–2127.

United States District Court,
C.D. Illinois,
Danville/Urbana Division.

Dec. 15, 1999.

---

Steven L. Blakely, Acton & Snyder, Danville, IL, for Plaintiff.

Frederick V. Lochbihler, David S. Barritt, Chapman & Cutler, Chicago, IL, Timothy Smith, Danville, IL, for First National Bank of Danville.

William L. Townsley, Sebat, Swanson, Banks, Garman & Townsley, Danville, GA, for International Genealogical Search.

### *ORDER*

McCUSKEY, District Judge.

On June 5, 1998, Plaintiffs, Vernon J. Dunlap and Alice C. Miller, filed their Complaint (# 1) against Defendants, the First National Bank of Danville (Bank) and International Genealogical Search, Inc. (IGS). This case is before the court for ruling on the Bank's Motion for Summary Judgment (# 14) and IGS's Motion for Summary Judgment (# 25). Both Motions for Summary Judgment are GRANTED.

### FACTS

The parties have submitted deposition transcripts and other documents in relation to the pending Motions for Summary Judgment. The following recitation of facts is derived from all of the documentation submitted by the parties.

Sylvester W. Jefferson died on October 31, 1994. He was 83 years old. He left no will and very few personal effects. Sylvester was a World War II veteran and was hospitalized in 1943 for severe mental problems. He remained disabled, and the Veterans Administration (VA) provided for his care until his death. He had not been visited by any family members for many, many years. The Bank was named guardian of Sylvester's estate in 1962. At the time of Sylvester's death, Susan Stratman was a vice president and trust officer at the Bank. She had primary responsibility for Sylvester's estate. Stratman attempted to locate family members to make funeral arrangements. She contacted Carol Bowen at the home where Sylvester had been living, contacted the local VA office in Danville and called a veteran's organiza-

tion in St. Louis, Missouri. She was unable to obtain any information about Sylvester's family. Stratman went ahead and made funeral arrangements.

Because of Sylvester's death, the guardianship was closed. The Bank then hired Alan Krapf to act as its attorney regarding the estate, which had substantial assets. Krapf had been the Bank's counsel for the guardianship of Sylvester's estate. The Bank, through Krapf, petitioned the circuit court of Vermilion County (Probate Court) for letters of administration so that a determination could be made where to distribute the assets in Sylvester's estate. On May 2, 1995, the Probate Court entered an Order appointing the Bank as the independent administrator of Sylvester's estate. Krapf published a "Death and Claim Notice" in a newspaper circulated in Vermilion County.

Stratman was responsible for overseeing the administration of Sylvester's estate. Stratman had very little information regarding Sylvester's family. She did have a handwritten letter which was found in an old billfold belonging to Sylvester. The billfold had been given to Stratman to put into the guardianship file. The letter stated that it was written in St. Louis and was dated October 11, 1943. It was addressed "hello Dad" and was signed "Samuel Jefferson." In the letter, Samuel said that he wished to see his Dad and hoped his Dad would be home for Christmas. The letter also mentioned "Mother" and "billy." The Bank also had a copy of a 1962 VA field examination request. This document stated that Sylvester had been hospitalized at the VA Hospital in Danville since 1944 and was 100% disabled. The document also stated that Sylvester had a wife, Lola L. Jefferson, who had two sons and lived in St. Louis. The Bank also had information that Lola had died in 1986.

Because Stratman had been unable to locate Sylvester's family and had little information to go on, she decided to hire an heir search firm to locate or determine the identity of Sylvester's heirs. She had seen

IGS's advertisements in a trust and estate magazine and had received mailings from them. She asked Krapf to contact them. On May 10, 1995, IGS sent a proposal to Krapf. The Bank accepted this proposal, and Stratman asked Krapf to oversee IGS's work.

On June 14, 1995, the Probate Court entered an order granting the Bank authorization to hire IGS "for the purposes of attempting to locate heirs-at-law of Sylvester Jefferson." In July 1995, Donald Metzger entered his appearance in the Probate Court on behalf of William Jefferson. Kemp & Associates, another heir search firm, also entered its appearance in the Probate Court through its attorney Gilbert Saikley. Saikley represented to the court that William Jefferson was Sylvester's heir and had signed a contract with Kemp & Associates. Metzger told Krapf that Kemp & Associates determined that Sylvester was married to Lola L. Young and that he and Lola had two children, William Jefferson and Samuel Jefferson. Metzger provided Krapf with a signed affidavit of heirship which asserted that William Jefferson and Samuel Jefferson were the descendants of Sylvester.

Randall White, Research Manager for IGS, received the case from IGS's sales department in June 1995. White said he is a professional genealogist, but is not licensed. In July 1995, White assigned the case to Cheryl Trent. Trent has been employed by IGS, or its affiliated company, International Tracing Services, since 1988. Trent testified that she has roughly two years of college in an unrelated field. Trent is not an accredited genealogist but was trained by management and senior employees as to how to conduct research through public records.

Trent stated that she and White reviewed the documents they received from Krapf. The documents received included: (1) a copy of the Probate Court Order authorizing the Bank to hire IGS; (2) Lola's death certificate; (3) Samuel's handwritten letter; (4) Sylvester's death certificate; and (5) the VA field examination request from 1962. Prior to Trent's involvement in the case, an IGS employee did some preliminary, usual background work, such as ordering census records, attempting to locate marriage records and so forth. There did not appear to be any records they could easily obtain. Trent attempted to obtain records from Social Security for Sylvester, William or Samuel and was unsuccessful. Trent sent a letter to the St. Louis School District requesting school records for William and Samuel and a letter to the St. Louis Registrar of Voters requesting information on William and Samuel. Trent received no response to these requests. White testified that they also checked city directory records for information.

Trent testified that she did obtain verbal information that William and Samuel were sons of Sylvester Jefferson. Trent stated that "there were a number of people who I had spoken to during the course of my research that told me that Sylvester Jefferson had two sons; William and ... Samuel." Trent stated she was given this information by Henrietta Parker, a cousin of Lola's, who she located based upon information from Lola's funeral records. Parker told her that neither William nor Samuel were married or had children. Parker told Trent the brothers lived together and took care of each other. Parker said one of the brothers was disabled and was in a wheelchair. Trent also spoke to Mildred Simmons, supervisor of Carr Square Tenant Management Office. Carr Square was the apartment or housing complex where William lived. Simmons said that Samuel had also lived there, but was deceased. William did not want to speak to Trent. However, William told Simmons that he was Sylvester's son, and Simmons relayed this information to Trent. William later agreed to speak to Krapf and told Krapf about Samuel's son, Gregory Jefferson. IGS was then able to locate Gregory.

Trent said she was not able to obtain birth certificates for William and Samuel. Trent stated that she was told by Cynthia

Dixon of St. Louis Vital Records that "there was no name of a father shown on the certificates." IGS's authorization only allowed them to obtain records related to Sylvester Jefferson. Since that name did not appear on the birth certificates, IGS could not obtain the records. Trent notified Krapf that she could not obtain the birth certificates and advised Krapf to subpoena them. Krapf testified that he did send a subpoena to the St. Louis division of vital records. He was not able to obtain the birth certificates.

On October 4, 1995, White sent a letter to Krapf which identified William and Samuel as the sons of Sylvester. The letter stated that William was born on November 1, 1929, and resided in St. Louis. The letter stated that William told Simmons that his father was "Sylvester Jefferson." William also told Simmons that he and his brother Samuel had the same father. According to the letter, Simmons also stated that William was "mildly mentally handicapped" but understood all that was taking place regarding Sylvester's estate. The letter further stated that Samuel was born on November 3, 1930, and died April 29, 1992. Krapf obtained a copy of Samuels's death certificate, which states that Samuel's father was Sylvester Jefferson.

Trent sent a letter to Krapf on October 5, 1995. This letter stated that IGS had spoken to a person at Missouri Family Services who had dealt with William for several years. Through this contact, IGS confirmed that William was somewhat mentally handicapped but that "he has been able to manage most of his affairs with some assistance, to date." On October 23, 1995, Trent sent a letter to Krapf stating that IGS had successfully located Gregory Jefferson, Samuel's son. The letter said that Gregory stated that Sylvester was his paternal grandfather.

On December 20, 1995, Gregory Jefferson appeared before the Probate Court and testified that he was 41 years old and lived in St. Louis. He testified that Sylvester had two children, Samuel Jefferson and William Jefferson. He stated that Sylvester was married to Lola Lee Jefferson and that both Sylvester and Lola were deceased. He testified that he was Samuel's only child and that he and William were "the sole remaining heirs" of Sylvester. On January 6, 1996, the Probate Court entered an Order which found that William and Gregory were Sylvester's "only heirs at law." On March 25, 1996, William appeared before the Probate Court. He testified that Sylvester Jefferson was his "daddy." He also testified that Gregory was the son of his brother Samuel. The Bank subsequently made distributions from the estate. On June 7, 1996, the Bank filed its final account in the Probate Court, showing all receipts and disbursements. The final account showed that IGS was paid $4,735 and the Bank received $5,350 for its administration of the estate. Gregory received a total of $158,874.16 and William received $103,439.10. Kemp & Associates received $52,958.05, its percentage of William's share of the estate pursuant to the terms of its contract with William. The final accounting also showed that Gregory and William received a total of $3,230.24 as reimbursement for expenses. On June 10, 1996, the Probate Court entered an Order closing the estate.

On January 21, 1997, Plaintiffs filed a petition to vacate the Probate Court's judgment pursuant to section 2–1401 of the Illinois Code of Civil Procedure (735 Ill. Comp. Stat. 5/2–1401 (West 1996)). Plaintiffs named as Defendants the Bank, IGS, Kemp & Associates, Inc., Gregory S. Jefferson and William Jefferson. Plaintiffs stated that they were Sylvester's only surviving heirs and attached affidavits showing how they were related to Sylvester. Dunlap stated that he was Sylvester's uncle, and Miller stated that she was Sylvester's first cousin. Plaintiffs further stated that William and Samuel were not born to or adopted by Sylvester. Plaintiffs attached to their petition documents which were sent to American Research Bureau, Inc. (ARB), a genealogical search firm, by

the Department of Veterans Affairs on January 8, 1997. These records included a deposition from Lola Lee Jefferson, dated August 29, 1944, apparently in regard to a request for VA benefits. Lola stated that she married Sylvester in St. Louis on December 28, 1934. She stated that William was born November 1, 1929, and was the son of Ford Stovall. Lola also stated that Samuel was born November 3, 1931, and was the son of Samuel Thomas. Lola stated that she was not married to either Stovall or Thomas. After her marriage to Sylvester, Sylvester accepted William and Samuel as his step children. Lola stated that her sons became known as William Jefferson and Samuel Jefferson and registered in school under those names. Other documents corroborated these facts, including a copy of Sylvester and Lola's marriage license and a copy of Samuel's birth certificate. The birth certificate was for "Samuel Young" and did not include the name of Samuel's father.

Plaintiffs filed an amended petition on September 5, 1997. In this petition, Plaintiffs stated that they were contacted by ARB in October 1995, at which time they were told they might be entitled to inherit from Sylvester's estate. They also stated "it was not until after June of 1996, that the ARB was able to determine the facts of decedent's heirship with sufficient specificity to establish that petitioners are entitled to inherit from the decedent."

The Probate Court dismissed the petition on December 8, 1997. The Probate Court specifically found that Plaintiffs had alleged no facts to establish or show due diligence on their behalf once they were informed that they may be heirs of Sylvester. Plaintiffs appealed. On September 10, 1998, the Appellate Court, Fourth District, affirmed the Probate Court's Order. *In re Estate of Jefferson*, No. 4–98–0018 (1998) (unpublished order). The Appellate Court rejected Plaintiffs' argument that the Probate Court should not have dismissed their amended petition because the order closing the estate was entered without notice to them and was obtained by fraud. The Appellate Court specifically found that no evidence showed that Plaintiffs or ARB ever contacted the Bank while the estate was open or at any time prior to filing the petition for relief. The court stated, "[t]hus, it was impossible for the [Bank] to provide notice to [Plaintiffs]." *Jefferson*, slip op. at 9. The court further stated:

Here, the record indicates [Plaintiffs] and ARB, acting on their behalf, had knowledge that they might be entitled to assets from [Sylvester's] estate at least as early as September 1995, when [Plaintiffs] signed contracts with ARB. Neither [Plaintiffs] nor ARB contacted the court or the administrator of the estate from that time until after June 1996, when the estate was closed. Moreover, it took another seven months after ARB determined that [Plaintiffs] were entitled to inherit from [Sylvester's] estate before they filed their initial petition for relief from judgment. Nowhere in the original petition, the amended petition or the affidavit of the president of ARB, do they mention what caused the delay.

[Plaintiffs] have not shown they acted with due diligence, nor have they shown why their lack of diligence should be excused. [Plaintiffs] did not enter their appearance at any time while the estate was open, and they were thus not entitled to notice of the proceedings. Finally, [Plaintiffs] have not alleged any facts to show that William and Gregory acted unjustly, unfairly, or were knowingly deceptive. *Jefferson*, slip op. at 9–10.

After the Probate Court denied relief, and while the appeal was still pending, Plaintiffs filed their Complaint against the Bank and IGS in this court. Plaintiffs alleged that Dunlap is a citizen of California and Miller is a citizen of Oklahoma. The jurisdiction of this court was based upon diversity of citizenship. Plaintiffs claimed that they were the only surviving heirs of Sylvester Jefferson and were entitled to receive the proceeds from his estate. In Counts I and II of their Com-

plaint, Plaintiffs alleged that the Bank, as independent administrator of Sylvester's estate, owed a fiduciary duty to Plaintiffs "to ascertain the identity and whereabouts of [Sylvester's] rightful heirs and ensure proper distribution to them according to the intestacy laws of the State of Illinois." Plaintiffs further alleged that the Bank was liable for damages for its breach of this duty. In Counts III and IV of the Complaint, Plaintiffs alleged that IGS breached its contract with the Bank "by failing to ascertain the correct identities of [Sylvester's] lawful heirs." Plaintiffs alleged that the terms of the contract were set out in the May 10, 1995, letter from IGS to Krapf. Plaintiffs further alleged that, as the legal heirs of Sylvester's estate, they were intended beneficiaries of the contract for services between the Bank and IGS. Plaintiffs therefore alleged that they were entitled to damages from IGS for IGS's breach of contract and implied warranties.

On December 14, 1998, the Bank filed a Motion for Summary Judgment (# 14), a Memorandum of Law in Support of the Motion (# 15), a Statement of Undisputed Facts (# 16), and the Affidavit of Susan A. Stratman with Supporting Documents (# 17). This court allowed Plaintiffs time to conduct discovery prior to responding to the Motion for Summary Judgment. On March 10, 1999, IGS filed a Motion for Summary Judgment (# 25) and a Memorandum of Law in Support (# 26). This court allowed Plaintiffs additional time to respond to this Motion as well.

On August 6, 1999, Plaintiffs filed Memoranda in Opposition to the Motions for Summary Judgment (# 39, # 42), Responses to the Bank's and IGS's Statements of Undisputed Facts (# 40, # 43) and Statements of Additional Undisputed Facts (# 41, # 44). In addition, Plaintiffs filed an Appendix of Evidentiary Submissions (# 45) and various documents in support of their opposition to the Motions for Summary Judgment, including deposition transcripts and documents from Sylvester's VA file.

On September 8, 1999, IGS filed a Reply to Plaintiffs' Response to its Motion for Summary Judgment (# 46) and the Bank filed a Reply Memorandum to Plaintiffs' Response to its Motion for Summary Judgment (# 47). On September 21, 1999, Plaintiffs filed an Objection to IGS's Reply (# 48) and an Objection to the Bank's Reply Memorandum (# 49). This court notes that, when granting Plaintiffs additional time to Respond to Defendants' Motions for Summary Judgment, this court specifically stated that each Defendant was allowed until September 8, 1999, to file a Reply to Plaintiffs' Response. Therefore, Plaintiffs' Objections are completely without merit. This court has considered IGS's Reply and the Bank's Reply Memorandum in ruling on the Motions for Summary Judgment.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In considering Defendants' Motions for Summary Judgment, all inferences to be drawn from the record should be viewed in the light most favorable to Plaintiffs. See *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989). However, this court is not required to draw every conceivable inference, but only those that are reasonable. *De Valk Lincoln Mercury, Inc. v. Ford*

*Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987); *St. Francis Hosp. of Evanston v. De Fever,* 1995 WL 387793, at *3 (N.D.Ill. 1995). Where the factual allegations presented by the party opposing the motion for summary judgment would not lead a rational trier of fact to find for the non-moving party, summary judgment is appropriate. *Holland,* 883 F.2d at 1312; *Lurie v. Fenchel,* 1997 WL 566393, at *3 (N.D.Ill.1997).

This is a diversity case, and the court must apply Illinois law to the state law claims asserted by Plaintiffs. *Timmerman v. Modern Indus. Inc.,* 960 F.2d 692, 696 (7th Cir.1992); *Lurie,* 1997 WL 566393, at *3. In this case, there is no serious dispute that the documents Plaintiffs presented to the Probate Court, including Lola's 1944 affidavit, establish that William and Samuel were not Sylvester's biological or adopted sons, but were his step children. Under Illinois' statute which sets out the "[r]ules of descent and distribution" for intestate estates, step children are not entitled to inherit any portion of an estate. See 755 Ill. Comp. Stat. 5/2–1 (West 1994). Also, neither the Bank nor IGS have presented any evidence which refutes Plaintiffs' claim that they are, in fact, Sylvester's heirs under this statute. There is also no dispute that neither the Bank nor IGS was aware of Plaintiffs' existence prior to the time Plaintiffs filed their petition to vacate the judgment in Probate Court in January 1997. Based upon these facts, this court must determine whether a genuine issue of material fact exists as to whether the Bank, IGS, or both, may be liable to Plaintiffs.

## II. BREACH OF FIDUCIARY DUTY

■ In their Complaint, Plaintiffs claim that the Bank is liable for the breach of its fiduciary duties to Plaintiffs. To prove an actionable breach of fiduciary duty on the part of the Bank, Plaintiffs carry the burden of showing "that a fiduciary relationship existed between the parties, that the trustee owed certain, specific duties to the plaintiff, that the trustee breached those duties, and, that there were resulting dam-

ages." *Chicago City Bank & Trust Co. v. Lesman,* 186 Ill.App.3d 697, 134 Ill.Dec. 478, 542 N.E.2d 824, 826 (1989), *app. denied,* 128 Ill.2d 662, 139 Ill.Dec. 511, 548 N.E.2d 1067 (1989); see also *Lurie,* 1997 WL 566393, at *3.

■ It is established under Illinois law that an administrator for an estate is impressed with fiduciary duties toward all the heirs and legatees of the estate. *Matter of Estate of Weir,* 120 Ill.App.3d 18, 75 Ill.Dec. 966, 458 N.E.2d 134, 139 (1983); see also *United States v. First Midwest Bank/Illinois, N.A.,* 1997 WL 675192, at *15 (N.D.Ill.1997). The Bank, as the administrator of Sylvester's estate, "was required to discharge its duties with as much fidelity and care as a prudent person would ordinarily bring to his or her own affairs." *Jewish Hosp. of St. Louis, Missouri v. Boatmen's Nat'l Bank of Belleville,* 261 Ill.App.3d 750, 199 Ill.Dec. 276, 633 N.E.2d 1267, 1281 (1994), *app. denied,* 157 Ill.2d 503, 205 Ill.Dec. 165, 642 N.E.2d 1282 (1994). An administrator must act with the highest degree of fidelity and with the utmost good faith in handling estate assets but is required to have only that degree of skill and diligence that he brings to his own similar personal business. *Jewish Hosp.,* 199 Ill.Dec. 276, 633 N.E.2d at 1281; see also *In re Estate of Coleman,* 262 Ill.App.3d 297, 199 Ill.Dec. 475, 634 N.E.2d 314, 317 (1994). Under Illinois law, a corporate administrator, such as the Bank, is held to no higher standard than is an individual administrator. *Jewish Hosp.,* 199 Ill.Dec. 276, 633 N.E.2d at 1281.

■ The parties have not cited, and this court has not found, any Illinois cases where a breach of fiduciary duty was found in a situation similar to the facts here. However, this court agrees with Plaintiffs that, under certain circumstances, the administrator of an estate may be liable for failing to determine the correct heirs of an estate. See *Madden v. Phelps,* 671 A.2d 870, 871 (Del.Ch.1995); *State of Maryland, for Use of Pitts v. Hayes,* 221 Md. 308, 157 A.2d 418, 419

(1960); *Shepherd v. Townsend,* 249 Miss. 383, 162 So.2d 878, 883 (1964), *sug. of err. overruled,* 249 Miss. 383, 163 So.2d 746 (1964); *Welch v. Flory,* 294 Mass. 138, 200 N.E. 900, 902 (1936). The court in *Madden* concluded that, if the distribution is made without court approval, the administrator is strictly liable to the injured heirs. *Madden,* 671 A.2d at 871–74. However, after "a final accounting has been signed by the court, misdelivery by an administrator will give rise to liability only if it represents a failure to exercise that degree of care that a fiduciary would exercise before distributing the corpus of a trust or the body of an estate." *Madden,* 671 A.2d at 871; see also *McCabe v. Rourke,* 301 Mass. 180, 16 N.E.2d 659, 660 (1938) (accountant who makes distribution in compliance with decree of Probate Court "is protected by the decree, unless he acted in bad faith or failed to exercise the sound judgment and the degree of diligence required by the circumstances"). Based upon this case law, this court concludes that the Bank could be subject to liability, even though it acted with the approval of the Probate Court, if it breached its fiduciary duties, as defined under Illinois law.

█ The case most closely on point factually is *In re Estate of Pennington,* 226 So.2d 881 (Fla.Dist.Ct.App.1969). In that case, James Pennington died intestate on October 25, 1962. The attorney for one of Pennington's creditors was appointed administrator of his estate. Pennington's landlord was unable to furnish the name of any relative of Pennington's, but stated that he thought there was a sister in England. Some letters found among Pennington's possessions indicated the existence of an elderly sister, Amelia Pennington, residing in England. The administrator wrote to the sister, and she wrote back "setting out the names of certain surviving brother and sisters, together with the children of a deceased brother and two deceased sisters" of Pennington. *Pennington,* 226 So.2d at 883. Several weeks after receiving the sister's letter, the administrator also received a letter from a lawyer in Michigan who mentioned Pennington's

sister in England but made no reference to the existence of any other heirs. On August 4, 1964, an order was entered by the County Judge approving the accounts of the administrator and directing distribution of the estate to Pennington's surviving brother and sister and the descendants of Pennington's deceased brother and sisters, all living in England. *Pennington,* 226 So.2d at 882. The administrator distributed the estate's assets in compliance with this order on September 8, 1964. *Pennington,* 226 So.2d at 882. On October 21, 1966, James Pennington and Wilfred Pennington filed a petition stating they were the natural sons of Pennington and were his only children and sole heirs. The sons claimed that the administrator was personally liable for the distribution of the estate assets because he had distributed the assets to persons other than Pennington's lawful heirs. *Pennington,* 226 So.2d at 882. The administrator did not question the fact that the petitioners were Pennington's sons, but testified:

> I made a direct inquiry to the only living relative requesting the family situation. She gave it to me and I relied upon it. We went through boxes of papers and we found nothing to indicate any names at all of family with the exception of this Miss A. Pennington... it did turn out she was a sister. I went ahead on that basis. *Pennington,* 226 So.2d at 883.

The County Judge denied the sons' petition. The Judge found that the administrator "exercised the diligence that an ordinarily prudent man would exercise under like circumstances" and that the "facts, while unfortunate, produced no case of chargeable negligence" against the administrator. *Pennington,* 226 So.2d at 883. Florida's District Court of Appeals affirmed this judgment, noting that the evidence showed "a normal and natural course of conduct on the administrator's part in his efforts to ascertain the rightful heirs" of Pennington. *Pennington,* 226 So.2d at 884.

In this case, one of the few clues the Bank had was a letter addressed to "Dad" signed "Samuel Jefferson." Because it did not have much to go on, the Bank hired an heir search firm, IGS. In the meantime, an attorney entered his appearance in Probate Court on behalf of William Jefferson. This attorney told Krapf, the Bank's attorney in this matter, that another heir search firm, Kemp & Associates, had determined that Sylvester had two sons, William and Samuel Jefferson. IGS then located William Jefferson who stated, through Simmons, that Sylvester was his father and that his deceased brother Samuel had the same father. William agreed to speak to Krapf and told him that Samuel had a son, Gregory Jefferson. IGS then located Gregory. Gregory testified before the Probate Court that William and Samuel were Sylvester's sons and that he was Sylvester's grandson. Based upon this testimony, the Probate Court found that William and Gregory Jefferson were Sylvester's heirs. Following the Probate Court's finding of heirship, the Bank distributed the assets of Sylvester's estate to Gregory and William.

Based upon these undisputed facts, this court concludes, similar to the court in *Pennington*, that the Bank exercised utmost good faith and used that degree of skill and diligence that it would bring to its own similar personal business. See *Jewish Hosp.*, 199 Ill.Dec. 276, 633 N.E.2d at 1281. This court finds that the facts show "a normal and natural course of conduct on the [Bank's] part in [its] efforts to ascertain the rightful heirs" of Sylvester. See *Pennington*, 226 So.2d at 884. Accordingly, like the administrator in *Pennington*, the Bank is not liable to Plaintiffs for the breach of its fiduciary duty as administrator of Sylvester's estate. See *Pennington*, 226 So.2d at 883; *McCabe*, 16 N.E.2d at 660–61 (finding that receiver "used due diligence in ascertaining the heirs" upheld even though supreme court was "not greatly impressed by the vigor of the efforts made by the receiver to search out all possible distributees" where receiver had no actual knowledge of the existence of

actual heir); *cf. Madden*, 671 A.2d at 871 (administrator did not meet the standard that the law demands of fiduciaries when he paid out the estate "almost immediately upon his appointment, without doing any significant investigation to uncover any previous marriage or of the children born of that marriage"); *Shepherd*, 162 So.2d at 882 (where executrix made no inquiry to determine heirship and her attorney only investigated one side of decedent's family, court found "neither the executrix nor anyone in her behalf exercised ordinary diligence in ascertaining the heirs"); *Welch*, 200 N.E. at 902 (administrator failed to make an adequate investigation to locate a known heir).

■ Plaintiffs argue, however, that the Bank was guardian of Sylvester's estate for over 30 years before his death and should have obtained information about his heirs prior to his death. This court concludes no facts presented by Plaintiffs support this argument. The facts show that Sylvester was mentally disabled since 1943, and Plaintiffs concede that Sylvester had almost no contact with any family members. Moreover, even assuming that information may have been more readily available prior to Sylvester's death, the Bank could not have breached its fiduciary duty as administrator of Sylvester's estate before it was named the administrator of the estate.

Plaintiffs also argue that the Bank should have conducted a further investigation when it was told by IGS that Sylvester was not named as the father on William and Samuel's birth certificates. Plaintiffs particularly argue that the Bank should have obtained Sylvester and Lola's marriage certificate, which showed they were married after William and Samuel were born, and Sylvester's VA file which contained documentation, including Lola's deposition, which showed that William and Samuel were Sylvester's step children, not his biological children. This court notes, however, that William testified that Sylvester was his "daddy" and Gregory testi-

fied that Sylvester was the father of William and Samuel. This testimony was found credible by the Probate Court and was corroborated by other information in the Bank's possession, including Samuel's handwritten letter, Samuel's death certificate which named Sylvester as his father, the fact that both William and Samuel had the last name "Jefferson," the representations by William's attorney, and the statement of Lola's cousin to Trent at IGS. In light of the information in the Bank's possession, it was not unreasonable for the Bank to conclude that no further investigation was necessary. This court further notes that Stratman had attempted to obtain information from the VA regarding Sylvester's family and was unsuccessful. This court declines to find that the Bank had a duty to obtain a VA file it did not know existed and did not know contained pertinent information.

In addition, this court notes that none of the documents submitted to this court, with the exception of Plaintiffs' affidavits, could have led the Bank or anyone else to locate Plaintiffs as relatives of Sylvester. As noted, there is no dispute that the Bank was not aware of the existence of Plaintiffs at any time before Plaintiffs filed their petition to vacate the judgment in the Probate Court. See *Matter of Jones,* 379 Mass. 826, 401 N.E.2d 351, 358 (1980) (conservator had no actual knowledge of the existence of any heirs and possessed no information which, if pursued, might have led to the discovery of kindred); *cf. Smith By Young v. Estate of King,* 579 So.2d 1250, 1251 (Miss.1991) (an administrator is under an affirmative duty to disclose to the court the existence of *known* potential heirs and claimants). This court also rejects Plaintiffs' suggestion that the Bank should have published its notice in Jackson County, where Sylvester was living before he died, or in the St. Louis area, where he spent the early years of his life. This court notes that publication in either of those venues would not have been any more likely to reach Plaintiffs than the publication in Vermilion County. As noted, Plaintiffs are residents of California and Oklahoma.

■ Plaintiffs finally argue that a genuine issue of material fact exists regarding whether the Bank breached its fiduciary duties when it hired IGS. Plaintiffs contend that White and Trent both testified that the Bank hired IGS solely to locate William and Samuel, not to determine who were the actual heirs of Sylvester. This court has carefully and thoroughly reviewed the deposition transcripts of White and Trent. This court concludes that Plaintiffs have mischaracterized their testimony. White testified that the intent of the search was to ascertain the identity of the persons referred to in the handwritten letter. White said that the Bank wanted IGS to resolve "whether those two persons were the sons of Sylvester Jefferson." White further stated that he determined that "the identities of these two individuals in this letter would be the most likely way of getting some answers in a quick amount of time." Trent testified that the task of IGS was to locate William and Samuel Jefferson and, if possible, attempt to determine their relationship to Sylvester. Trent stated that William and Samuel "needed to be identified and find out what their relationship was." Trent did testify that it did not make any difference to *her* whether William or Samuel were related to Sylvester. However, Trent's testimony, taken as a whole, showed that her task was to locate William and Samuel and find out their relationship to Sylvester.

This court concludes that the actual statements of White and Trent do not support an inference that the Bank hired IGS solely to find William and Samuel, without regard to whether William and Samuel were actually Sylvester's heirs. Based upon this record, there is no genuine issue of material fact as to whether the Bank breached its fiduciary duty when it hired IGS, with Probate Court approval. See *Jones,* 401 N.E.2d at 358–59 (conservator not required to retain the services of a professional genealogist).

Based upon the pertinent case law, this court concludes that the Bank did not breach any fiduciary duty owed to Plaintiffs. Accordingly, the Bank is entitled to judgment in its favor as a matter of law.

## III. THIRD PARTY BENEFICIARY CLAIMS

In their Complaint, Plaintiffs claim that they were third party beneficiaries of the contract between IGS and the Bank. They further claim that IGS is liable to them for breach of the contract and for breach of implied warranties. In its Motion for Summary Judgment, IGS first argues that Plaintiffs are not third party beneficiaries of the contract between the Bank and IGS.

If a contract is entered into for the direct benefit of a third person, the third person may sue for a breach of the contract in his or her own name, even though the third person is a stranger to the contract and the consideration. *Olson v. Etheridge*, 177 Ill.2d 396, 226 Ill.Dec. 780, 686 N.E.2d 563, 566 (1997). For a third party to have a cause of action, "[t]he contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." *Lippert Marketing, Ltd. v. Kingwood Ceramics, Inc.*, 1998 WL 699023, at *19 (N.D.Ill.1998) (quoting *Waterford Condominium Ass'n v. Dunbar Corp.*, 104 Ill. App.3d 371, 60 Ill.Dec. 110, 432 N.E.2d 1009, 1011 (1982)). Illinois follows the "intent to benefit" rule. *XL Disposal Corp. v. John Sexton Contractors Co.*, 168 Ill.2d 355, 213 Ill.Dec. 665, 659 N.E.2d 1312, 1316 (1995). Under that test, third-party beneficiary status is a matter of divining whether the contracting parties intended to confer a benefit upon a nonparty to their agreement. *XL Disposal Corp.*, 213 Ill.Dec. 665, 659 N.E.2d at 1316; see also *Ahern v. Board of Educ. of City of Chicago*, 133 F.3d 975, 983 (7th Cir.1998). It is not enough that a party receive merely an incidental benefit. *Ahern*, 133 F.3d at 983.

Plaintiffs' contract claim is based on IGS's May 10, 1995, letter to Krapf. This letter included a "Results or No Charge" fee quotation "to provide professional search services on your behalf." IGS proposed a $4,150 fee "[t]o prove or disprove the existence of descendants of Sylvester Jefferson, alive or deceased, within 90 days of commencing our search" and an additional $195 fee per person "[t]o further identify, locate, prove and report each individual as a descendant of Sylvester Jefferson." IGS attached a copy of a "'To Whom it May Concern" letter and asked that the Bank prepare the letter on Bank letterhead. The Bank did so, and the letter stated that the Bank authorized IGS to represent the Bank "in the locating of the heirs at law of Sylvester W. Jefferson." The letter also stated that IGS was authorized to obtain public and private records "necessary to establish and identify next of kin, heirs at law and collateral relatives of the deceased, Sylvester W. Jefferson." On June 14, 1995, IGS sent a letter to Krapf stating that it had commenced a search on the basis of the terms set out in the quotation of May 10, 1995.

The parties have not cited and this court has not found any Illinois case law, or indeed *any* case law, which holds that the heirs of an estate are third-party beneficiaries of a contract between the administrator of an estate and an heir search firm such as IGS. Nevertheless, this court concludes that the heirs of the estate are clearly intended beneficiaries of such a contract.

However, for Plaintiffs to recover as third-party beneficiaries to the contract, they must establish that IGS breached its contract with the Bank. To "sustain a cause of action for breach of contract, a plaintiff must establish that there was a wrongful act and that a loss or damages resulted directly from it." *Jackson v. Hammer*, 274 Ill.App.3d 59, 210 Ill.Dec. 614, 653 N.E.2d 809, 813 (1995), *app. denied*, 164 Ill.2d 565, 214 Ill.Dec. 321, 660 N.E.2d 1270 (1995). As IGS points out, a third-party beneficiary cannot expand the "liability of the promisor." See *Carson Pirie Scott & Co. v. Parrett*, 346

Ill. 252, 178 N.E. 498, 501 (1931); see also *Altevogt v. Brinkoetter*, 85 Ill.2d 44, 51 Ill.Dec. 674, 421 N.E.2d 182, 187 (1981).

The language of the May 10, 1995, letter stated that, in return for a proposed fee, IGS promised "[t]o prove or disprove the existence of descendants of Sylvester Jefferson, alive or deceased, within 90 days of commencing our search" and "[t]o further identify, locate, prove and report each individual as a descendant of Sylvester Jefferson."

The undisputed facts in this case show that IGS located William and Gregory. Although IGS was not able to obtain documentation showing they were descendants of Sylvester, Trent testified that "to the best of the information we were able to develop ... [t]here was the appearance that they were the sons of Sylvester Jefferson." Trent stated that she was able to obtain oral statements to support this conclusion. Further, when IGS was unable to obtain birth certificates for William and Samuel, it did the only thing it could do. It notified Krapf that it could not obtain the birth certificates and advised Krapf to subpoena them. Unfortunately, Krapf was similarly unsuccessful in obtaining the birth certificates. However, following IGS's location of William and Gregory, Gregory testified in the Probate Court that William and Samuel were Sylvester's sons and that he and William were Sylvester's heirs. Subsequently, William also testified and confirmed that Sylvester was his "daddy." This court concludes that oral testimony in open court was "proof" that William and Gregory were descendants of Sylvester. This court notes that, based upon the record before this court, it appears that both Gregory and William were not being dishonest when they testified, but were stating what they believed to be the truth.

This court concludes that, based upon the extremely unique facts and circumstances of this case, IGS fully performed its obligations under the terms of its contract with the Bank. This court further notes that, once the Probate Court entered its Order finding that William and Gregory were Sylvester's heirs, there was no need for IGS to proceed any further. Accordingly, Plaintiffs cannot recover as third-party beneficiaries for breach of the contract.

IGS next argues that Plaintiffs' claim based upon implied warranties must fail because sales of services do not carry implied warranties. This court agrees that, other than two narrow exceptions which do not apply here, "the recognition of implied warranties has been limited to the sale of goods, not services." *American Labelmark Co. v. Akiyama Corp. of America*, 1993 WL 460838, at *2 (applying Illinois law). In their Response to IGS's Motion for Summary Judgment, Plaintiffs concede that they cannot have a claim based upon implied warranties. However, Plaintiffs now argue that they have a claim based upon an express warranty. Plaintiffs acknowledge that they did not specifically plead breach of express warranty but argue "such a claim should be allowed under the liberal federal notice pleading rules."

An action for breach of an express warranty in a service contract is recognized in Illinois. *Oak State Products, Inc. v. Ecolab, Inc.*, 755 F.Supp. 235, 237 (C.D.Ill.1991). In order to succeed on a claim based upon the breach of an express warranty, a plaintiff must prove (1) that the defendant made a warranty regarding a material fact; (2) that the warranty was made for the purpose of inducing the plaintiff to enter into the contract; and (3) that the plaintiff relied on the defendant's warranty. *St. Francis Hosp.*, 1995 WL 387793, at *4. An express warranty in a contract is to be interpreted in a manner that is consistent with the clear and natural import of the language used and in consideration of the subject matter. *Board of Managers of Winston Towers No. 4 Condominium Ass'n v. Westinghouse Electric Corp.*, 1992 WL 168786, at *3 (N.D.Ill.1992) (citing *Illinois Valley Asphalt, Inc. v. LaSalle Nat'l Bank*, 54 Ill. App.3d 317, 12 Ill.Dec. 28, 369 N.E.2d 525,

529 (1977)). A third-party beneficiary may sue for the breach of an express warranty. See *In re Masonite Corp. Hardboard Siding Products Liability Litigation*, 21 F.Supp.2d 593, 599–600 (E.D.La.1998).

In support of their claim for breach of express warranty, Plaintiffs argue: "[t]he intention of the parties is . . . to be gleaned from the letter of May 10, 1995, which all agree contains the terms and provisions of the engagement agreement; and that letter clearly states that IGS was to locate and identify Sylvester's descendants." This court agrees that this was the only express warranty included in the May 10, 1995, letter. This court has already concluded that, under the unique facts present here, IGS performed this promise. While Plaintiffs have found much to criticize regarding IGS's performance, they have not referred to any documents which IGS could have located which could have led IGS to identify Plaintiffs as heirs of Sylvester. As a result, Plaintiffs cannot recover from IGS based upon a breach of an express warranty. Therefore, IGS is entitled to judgment as a matter of law.

## IV. ESTOPPEL

Because this court has concluded that the undisputed facts establish that the Bank did not breach its fiduciary duty as administrator of Sylvester's estate and IGS did not breach its contract with the Bank, there is no need for this court to consider the other arguments raised by Defendants in support of their Motions for Summary Judgment. This court does note, however, that it finds Defendants' estoppel arguments persuasive. The undisputed facts show that Plaintiffs knew they were potential beneficiaries of Sylvester's estate at least as early as September 1995, when they entered into a contract with ARB. This was well before the Probate Court made its heirship finding, well before any distributions were made of the estate assets and well before the estate was closed. However, neither Plaintiffs nor ARB took any action regarding Sylvester's estate until January 1997. This court believes that Plaintiffs may well be estopped from bringing any action based upon their own inaction, and the inaction of ARB, which was acting on their behalf. See *Bituminous Trucking & Equip. Co. v. Delta Air Lines, Inc.*, 189 F.2d 307, 310 (7th Cir.1951); see also *In re Walton Hotel Co.*, 116 F.2d 110, 112 (7th Cir.1940); *Jurek v. Smuczynski*, 61 Ill.App.2d 426, 209 N.E.2d 850, 853 (1965).

IT IS THEREFORE ORDERED THAT:

(1) The Bank's Motion for Summary Judgment (# 14) is GRANTED.

(2) IGS's Motion for Summary Judgment (# 25) is GRANTED.

(3) Because Judgment has been entered in favor of both Defendants, the Bank's Cross–Claim (# 38) against IGS is dismissed as moot.

This case is terminated. The parties shall be responsible for their own court costs.