Maurice L. QUINN, Plaintiff–Appellant,

v.

The McGRAW–HILL COMPANIES, INC., Defendant–Appellee.

No. 97–3269.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1998.

Decided Feb. 16, 1999.

James E. Beckley (argued), Beckley & Associates, Wheaton, IL, Bernard G. Segatto, Barber, Segatto, Hoffee & Hines, Springfield, IL, for Plaintiff–Appellant.

Robert C. Krupka, David K. Callahan (argued), Jennifer Anderson VanKirk, Kirkland & Ellis, Chicago, IL, Lance T. Jones, Springfield, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and WOOD, Jr. and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Maurice Quinn was the majority shareholder for two small banks in central Illinois. At the suggestion of a broker, Quinn invested in certain instruments called "collateralized mortgage obligations," or CMOs, loosely referred to as bonds in the proceedings. He felt confident in doing so because the broker assured him that Standard & Poor's (S & P) would give the CMOs an "A" rating, which in due course it did. Unfortunately, the bonds did not turn out so well, and, Quinn asserts, anyone should have realized their true quality from the start. Later, when S & P downgraded their rating, Quinn (because of his substantial ownership interest in the banks)

lost a considerable amount of money. He sued S & P, which is a division of McGraw–Hill, Inc., in state court alleging negligent misrepresentation and breach of its contract with the issuer, claiming that he was a third-party beneficiary to the latter deal. (We refer to the defendant throughout as S & P, even though the formal corporate entity before the court is McGraw–Hill.) After the case was removed to federal court, the district court granted S & P's motion to dismiss under Rule 12(b)(6) for failure to state a claim. We affirm.

## I.

The banks in which Quinn and other members of his family held an interest were the Brown County State Bank and Wemple State Bank, in Waverly, Illinois ("the Banks"). The complaint alleges that Quinn and his wife Margaret owned the controlling interests in Maurice L. Quinn Properties, Inc. ("Quinn Properties"), an Illinois corporation, and that Quinn Properties owned the controlling interest of the Brown County State Bank. Quinn Properties, Maurice Quinn, Margaret Quinn, and two of their sons owned the controlling interest in the Wemple State Bank. Both banks had accounts with Robert Thomas Securities, Inc., and William Carroll, a registered securities dealer. On November 7, 1991, Carroll called Quinn and suggested that he buy, on behalf of the Banks, an American Home Acceptance Corp. ("AHAC") CMO. Under the offering, bonds were to be issued for a face value of no less than $100,000; the total issue was $1,290,000, meaning that a maximum of twelve buyers was possible. Carroll also faxed to Quinn an internal memorandum that said the issuers anticipated an "A" rating from S & P for the CMO. The memorandum also represented that the CMOs were collateralized by Federal Housing Authority Title I loans.

Relying on Carroll's recommendation and information, Quinn decided to have the Banks buy the entire $1,290,000 issue of the bonds. He could not have done so, nor could AHAC have issued them, if they had been rated at less than the "A" level by S & P. In fact, as Carroll had anticipated, S & P had a contract with AHAC and its parent, Rausch-er, Pierce, Refsnes ("RPR") to rate the bonds. Prior to their formal issuance, as Carroll also had expected, S & P gave the bonds an "A" rating, even though (Quinn believes) various economic signs suggesting the folly of this rating should have been apparent to it. When the bonds were issued, Quinn followed through with his purchase on behalf of the two banks. The day afterwards, RPR sent Quinn a letter informing him that he could review RPR's "Confidential Placement Memo and Supplement." That memo warned that (1) "substantial risks are involved in an investment in the Bonds," (2) an S & P rating was "not a recommendation to buy, sell, or hold any such Bonds and may be subject to revision or withdrawal at any time," and (3) the bonds were "non-recourse obligations solely of the Issuer and are not insured or guaranteed."

None of these cautions sent up any red flags in Quinn's mind. Instead, he held the bonds, and for about two and a half years after their issuance, S & P continued to rate them as "A" grade. In August 1994, however, S & P abruptly dropped the rating from "A" to "CCC," an eleven point plunge. Bonds rated "CCC" are "junk" quality, not the investment quality required by banks. Even so, the bonds continued to pay interest for some time thereafter. When Quinn sold his interest in the two banks in May 1995, the bonds were still good; Quinn personally paid the Banks the principal amount of the bonds and took an assignment of any claim the Banks may have had against S & P and the issuer. Almost immediately thereafter, the bonds defaulted.

■■■■ Quinn, as assignee of the Banks' interests, sued S & P in state court alleging negligent misrepresentation and breach of the contract between S & P and AHAC, to which Quinn claimed to be a third-party beneficiary. S & P removed to federal court based on diversity. The Second Amended Complaint in federal court alleges that Quinn is a citizen of the State of Illinois, that defendant McGraw–Hill is a New York corporation with its principal place of business in New York, that S & P is an unincorporated group within McGraw–Hill, and finally that the

amount in controversy exceeds $75,000.[1] The district court granted S & P's motion to dismiss under Rule 12(b)(6), finding first that Quinn could not show that he was a third-party beneficiary of the contract between S & P and AHAC, and second that S & P had no duty to communicate accurate information to him and thus could not be liable for any negligence in the information furnished with the bonds at the time of purchase.

## II

### A. *Breach of the S & P/AHAC Contract*

■ Quinn realizes that he is entitled to proceed under this theory only if he can show that he (meaning, in context, the Banks) is a third-party beneficiary of the contract. The parties agree that Illinois law governs this claim. The Supreme Court of Illinois has explained that "Illinois follows the 'intent to benefit' rule; that is, third-party beneficiary status is a matter of divining whether the contracting parties intended to confer a benefit upon a nonparty to their agreement." *XL Disposal Corp. v. John Sexton Contractors Co.,* 168 Ill.2d 355, 213 Ill.Dec. 665, 659 N.E.2d 1312, 1316 (Ill.1995) (citation and internal quotations omitted). At the same time, Illinois has made it very difficult to prove intent to benefit the third party, because "there is a strong presumption that parties to a contract intend that the contract's provisions apply to *only* them and not to third parties." *155 Harbor Drive Condominium Ass'n v. Harbor Point, Inc.,* 209 Ill.App.3d 631, 154 Ill.Dec. 365, 568 N.E.2d 365, 375 (1991) (emphasis in original). Express language in the contract identifying the third-party beneficiary is the best evidence of intent to benefit that party, but the courts have also accepted an implied showing where "the implication that the contract applies to third parties [is] so strong as to be practically an express declaration." *Id.* Without an express declaration, in short, ambiguous language in a contract will not suffice to make someone a third-party beneficiary.

■ Quinn asserts that the parties must have known that investors like him were the beneficiaries of the rating contract, because S & P's "very existence as an independent rating agency is doubtful without investor reliance on its ratings." This is just the way bond markets work, he points out, and it would be unrealistic to drive a wedge between the value the issuer receives from S & P's rating service and the value the purchasers receive. Without potential purchasers, the ratings would exist in a vacuum, benefitting no one. Quinn also argues in the alternative that he was an intended beneficiary of the obligation S & P undertook to provide "continuous monitoring and surveillance" of the bonds for AHAC.

■ We do not doubt that investors derive valuable information from an S & P bond rating, both at the time of purchase and during the time they hold the bonds. The pertinent question, however, is whether the actual AHAC/S & P contract contains either express language identifying purchasers like Quinn by name or its functional equivalent. Here, Quinn practically concedes in this court that he cannot meet Illinois's high standard. He has not referred us to any text at all in the contract that would indicate, either explicitly or implicitly, the necessary intent to benefit. Instead, his argument is almost a structural one, relying on the way he thinks bond markets work. In our view, an Illinois court would find this insufficient as a matter of law to state a claim for breach as to a third-party beneficiary. Quinn and other investors may be indirect beneficiaries of S & P ratings, to the extent that the issuer does not capture the full benefit of the rating, but Quinn has underestimated the direct value of a rating to the issuer. Once the issuer knows the rating its instruments will earn, it has a better idea of which customers are

1. The Second Amended Complaint was filed in this court on March 13, 1998, after oral argument. It corrects a defective jurisdictional allegation in the Amended Complaint filed May 30, 1997, in the district court, which alleged only Quinn's residence, not his citizenship. Allegations of residence are insufficient for purposes of establishing jurisdiction under 28 U.S.C. § 1332. See *Held v. Held,* 137 F.3d 998, 1000 (7th Cir. 1998). Nevertheless, amendment even at this late date to correct a defective jurisdictional allegation is permissible under 28 U.S.C. § 1653. See *id.*

likely to be interested, what interest rate (or other element of price) to attach to the placement, and where it stands relative to others in its line of business. In short, this is a perfectly reasonable—perhaps even indispensable—contract for AHAC to have entered for its own purposes. Contracts between two parties often generate information that is valuable to third parties: manufacturers of electrical appliances contract with Underwriters Laboratories to have their devices tested and approved, so that consumers will want to choose them; universities hire faculty members, thereby signaling to prospective students who the best scholars and teachers are. We do not understand Illinois law to infer that the ultimate consumers who benefit from contracts whose purpose is to generate information are third-party beneficiaries of those contracts and thus entitled to sue for breach. The district court correctly dismissed this part of Quinn's claim.

### B. *Negligent Misrepresentation*

 Moving from contract to tort, Quinn also alleges that S & P was guilty of negligent misrepresentation when it gave the AHAC bonds an "A" rating, in light of the information then known to it. The negligent misrepresentation claim in Illinois requires a plaintiff to plead and prove:

(1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by defendant, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, (5) damage to the other party resulting from such reliance, and (6) a duty owed by defendant to plaintiff to communicate accurate information.

*Rosenstein v. Standard & Poor's Corp.*, 264 Ill.App.3d 818, 201 Ill.Dec. 233, 636 N.E.2d 665, 667 (1993). The Illinois Supreme Court has recognized that the tort of negligent misrepresentation extends to third parties who lack privity with the defendant where the "defendant knew the information would be used and relied upon" and "the potential liability was restricted to a comparatively small group." *Id.* at 668, citing *Rozny v.*

*Marmul*, 43 Ill.2d 54, 250 N.E.2d 656 (Ill. 1969).

The Illinois Supreme Court has recognized a close relation between the tort of negligent misrepresentation and the action for common law fraud. In *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (Ill.1989), that court explained:

The elements for these two causes of action [i.e. negligent and fraudulent misrepresentation] which a successful plaintiff must plead and prove are quite similar. In *Soules v. General Motors Corp.* we formulated the elements in a fraudulent misrepresentation as: (1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance. Negligent misrepresentation has essentially the same elements, except that the defendant's mental state is different. The defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action. For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information.

*Id.* at 591 (citations omitted).

 The reliance element—fourth in both the *A, C & S* and *Rosenstein* lists—is not one that the Illinois Supreme Court indicated should be treated differently in the negligent misrepresentation cases and the fraud cases. This is important because the requirement that reliance must be reasonable has been articulated somewhat more often in fraud cases than in misrepresentation cases, but, as the discussion in *A, C & S* demonstrates, it applies to both. Indeed, in *A, C & S* itself, the Illinois Supreme Court indicated that on remand there might be an issue about the justification for the plaintiffs' reliance in the negligent misrepresentation part of the action. 137 Ill.Dec. 635, 546 N.E.2d at 593. See also *Perschall v. Raney*, 137 Ill. App.3d 978, 92 Ill.Dec. 431, 484 N.E.2d 1286,

1290 (1985) (no requirement of a guaranty of accuracy for tort of negligent misrepresentation, but this is "a factor to be considered in determining whether a plaintiff's reliance is foreseeable and justifiable"); *Kuch & Watson, Inc. v. Woodman,* 29 Ill.App.3d 638, 331 N.E.2d 350, 354 (1975) (reasonable reliance must be shown).

 The district court offered several reasons for rejecting this part of Quinn's case: first, it found that Quinn bought the bonds only on Carroll's promise of the "A" rating, not on S & P's actual representation, which negated both the false statement and the reliance elements; second, it found that this was not a case where *potential* liability was restricted to a small class, even though the actual placement could have gone only to a maximum of twelve buyers. We find it unnecessary to address either of these reasons, because we find that the district court's judgment can be supported on the alternate ground that Quinn cannot show that his reliance on the S & P rating was reasonable. (Our review on this appeal from a 12(b)(6) dismissal is *de novo,* of course, and S & P has presented this theory in support of the judgment.)

At the same time Quinn found out that the bonds had indeed been rated "A," he received the letter from RPR informing him that substantial risks were involved in this type of investment. The same letter cautioned that an S & P rating was "not a recommendation to buy, sell, or hold any such Bonds and may be subject to revision or withdrawal at any time." Furthermore, the Private Placement Memorandum and its supplement both stated that the bonds were not insured or guaranteed. In addition to these explicit statements, which should have alerted Quinn to the fact that he was responsible for doing his own homework about the risks he was assuming, Quinn himself (an experienced banker) knew as of March 1993 from a letter AHAC had sent him that over $1 million of the mortgage loans were more than 30 days delinquent, the reserve fund balance was only $131,051, and the FHA Title I Insurance balance was $600,385. Quinn chose to take no action at that time; indeed, he let matters ride for a long time, until after S & P had downgraded its own rating.

In light of these facts, no reasonable jury could find that Quinn reasonably relied on S & P's evaluation of the quality of the bonds. At best, he might have hoped that the bonds would retain a higher market value than they should have had for some period of time, until the true facts came out. Ultimately, of course, matters evolved to the point where S & P decided it had no choice but to downgrade the bonds steeply. While it is unfortunate that Quinn lost money, and we take him at his word that he would not have bought the bonds without the S & P "A" rating, any reliance he may have placed on that rating to reassure himself about the underlying soundness of the bonds was not reasonable.

We therefore AFFIRM the judgment of the district court.