2023 IL App (1st) 210795-U

SECOND DIVISION
May 30, 2023

No. 1-21-0795

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| ASHLAUR CONSTRUCTION COMPANY, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|  | ) | Cook County |
|  | ) |  |
| v. | ) | 18 CH 00580 |
|  | ) |  |
| THE LEVY COMPANY, | ) | Honorable |
|     Defendant-Appellee. | ) | James Snyder, |
|  | ) | Judge Presiding. |
|  | ) |  |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* Affirmed as modified. Court's judgment for defendant on third-party beneficiary claim affirmed, as plaintiff did not establish elements of underlying breach of contract. Judgment denying plaintiff's claim for "extras" compensation was not against manifest weight of evidence. Judgment in favor of plaintiff on *quantum meruit* claim affirmed but modified to correct mathematical error on calculation of damages.

¶ 2    Seeking to build a new marquee hotel at the McCormick Center complex in Chicago, the Metropolitan Pier and Exposition Authority (MPEA) entered into a joint venture with several large construction contractors. That joint venture subcontracted with defendant Levy Company to perform work on the interior walls of the hotel. Levy in turn hired Ashlaur Construction, a minority business enterprise (MBE), a sub-subcontractor and plaintiff here, to hang and tape

drywall in the hotel. Ashlaur and Levy valued the contract between them at approximately $6.34 million, about half of which went to cover labor costs, the rest going to materials and Ashlaur's hiring of a subcontractor to install insulation.

¶ 3      But things did not go to plan—at least in Ashlaur's opinion. It estimated that it would take approximately 32,000 hours of labor to complete their part of the project. However, when everything was done, Ashlaur's president went back to Levy, said it had taken 47,000 hours of work to complete the project and demanded more than $1 million in payment to cover those unexpected costs.

¶ 4      When Levy refused, Ashlaur filed suit. The case went to a bench trial, where Ashlaur argued three things. First, it claimed that, although Ashlaur was not a party to the contract between the Joint Venture and Levy, it should be considered an intended third-party beneficiary and thus allowed to sue for additional money it believed was owed to it as an MBE on the project. Second, it argued that Levy was in breach of the Levy-Ashlaur contract because Levy refused to pay for the additional hours it took to complete the job. Finally, Ashlaur sought relief under *quantum meruit*, seeking recompence for the benefit of the extra work it bestowed on Levy.

¶ 5      At the close of Ashlaur's case, the court entered judgment for Levy on the first two counts but eventually awarded Ashlaur about $110,000 in *quantum meruit* damages. For the following reasons, we affirm the judgment in full but modify the award of damages to Ashlaur on its *quantum meruit* claim to correct a mathematical error.

¶ 6                                     BACKGROUND

¶ 7      In the mid-2010s, MPEA commissioned a hotel to be built near the McCormick Center campus in Chicago. MPEA and several large construction companies (none of whom are parties

here) entered into a joint venture (JV). In March 2016, the Levy Company and the JV agreed to a $12 million contract (which we will refer to as the JV-Levy contract) for Levy to construct the interior walls of the hotel.

¶ 8       In Exhibit B of the JV-Levy Contract, the parties laid out what they expected to be the process of the drywall work. Relevant here, the work was expected to "progress on two (2) floors concurrently," and the drywall in the guestrooms would "be completed in two (2) separate sequences[.]"

¶ 9       The contract also included minority-inclusion obligations, requiring Levy to hire and use MBEs for a portion of the work, in accordance with MPEA requirements. Specifically, the relevant clause said: "Subcontractor shall provide the minimum MBE/WBE participation in accordance with Appendix A of the Design Build Agreement: MBE 50%." However, the contract did not specify a particular MBE or otherwise detail how that 50 percent was to be distributed. When Levy signed the contract with the JV, it had not identified the MBE or MBEs it would use.

¶ 10      Levy began to search for an MBE and eventually picked Ashlaur. On May 20, 2016, Levy and Ashlaur signed off on a $6 million contract (the Levy-Ashlaur contract). That contract specified that Levy would pay Ashlaur approximately $3 million for the labor to hang and tape drywall in the hotel and purchase the materials Ashlaur would use for $3 million.

¶ 11      The Levy-Ashlaur contract included a section titled "Work" that, coupled with an exhibit that was incorporated into the contract, laid out the scope of the job, as well as the process by which Levy and Ashlaur would address the need for extra work. As to the latter, the contract said: "No extra work or changes under this Sub-subcontract will be recognized or paid for unless agreed to in writing before the work is done or changes are made."

¶ 12    In the exhibit attached and adopted by the contact, the parties broke down the scope of the work and added several "clarifications." The parties expected that the materials—drywall, steel, and blocking—would cost approximately $2.5 million. They added another $835,000 for insulation, and Levy agreed to pay Ashlaur a service charge of $125,000 to manage the materials. The exhibit estimated the hotel would require more than 3 million square feet of hanging and another 2.1 million square feet of taping. The contract also budgeted $3 million for the labor costs. In the clarifications section, the exhibit said that "[h]anging and taping square footages that are enclosed are the basis for the agreed upon price."

¶ 13    Work began, and Levy and Ashlaur (among many other contractors) began constructing the walls on the 5th through 40th floors of the hotel. Since the project was ultimately paid for and overseen by MPEA, a municipal corporation created by law, the project required any contractor working on it to submit extensive documentation on such details as payments that were made and work that was completed.

¶ 14    To document its progress, Ashlaur submitted standard construction schedule of values (SOVs) each month. These SOVs included estimates on the completion percentage of particular projects on individual floors and tasks, payroll records and proof of hours worked, and costs for supplies and materials. Ashlaur was to complete the work in two sequences, hanging and taping drywall on each floor. The first step was to finish the bathrooms, then move on to the guest rooms and corridors. Each step was to be completed before Ashlaur moved onto the next floor.

¶ 15    However, it was common for Ashlaur to leave some work on individual floors unfinished and move on because of various delays, mostly due to other work being done on the hotel. But the parties anticipated as much, and Ashlaur would always return later to finish whatever needed to be done, including touchups. That said, the number of times Ashlaur had to return to a floor to

finish the job impacted the pace and efficiency of the job.

¶ 16    So the parties would execute extra-work orders. Ashlaur would prepare an Extra Work Order ticket, which Levy would then approve. Once approved, Levy would issue a formal change order to amend the Levy-Ashlaur contract. Levy signed off on every change order—14 in total—that Ashlaur presented before the end of the project.

¶ 17    By the end of July, Levy had paid Ashlaur most of what it believed Ashlaur was due under the contract. However, Zollie Carradine, Ashlaur's president, sent Levy's leadership an email on August 11, 2017, highlighting some concerns about the amount of work Ashlaur had to perform to finish the project. In that email, he said the project had taken 47,000 hours, partly because Ashlaur "did not have 1 floor of sequence work on the entire project." Carradine said the sequence of the work required Ashlaur workers to return to each floor three times to complete the job, but that Ashlaur had actually visited each floor an average of eight times.

¶ 18    Three days later—August 14—Carradine sent Levy a letter demanding $1.4 million in additional payment. Carradine said the $3 million in labor was budgeted for 32,000 man-hours of work, but that the project took 47,000 hours instead. Carradine blamed the out-of-sequence work requirements, a lack of funding for some areas of the hotel including the elevator lobbies and presidential suites, and an underestimate on the amount of taping.

¶ 19    Carradine's email "stunned" Craig Schwartz, one of Levy's vice-presidents. Levy believed the project was 99 percent finished and that there was no indication that Ashlaur had done so much unpaid extra work. Ten days after receiving Carradine's letter, Schwarz sent Carradine a detailed response, saying his demand was a "complete surprise to Levy." Despite the brewing dispute, Levy paid Ashlaur for the work completed in August 2017, the final month of work on the project, although not the extra payment Carradine wanted.

¶ 20    In January 2018, Ashlaur filed a multi-count complaint against Levy, as well as the MPEA and the Joint Venture. About 11 months later, Ashlaur filed an amended, four-count complaint, this time only against Levy. Count 1 alleged breach of the JV-Levy contract, with Ashlaur seeking to sue as a third-party beneficiary of that contract. Count 2 alleged breach of the Levy-Ashlaur contract. In Count 3, Ashlaur sought *quantum meruit* damages for the completed work. Count 4 was later dismissed and is not relevant to this appeal.

¶ 21    After the complaint survived a motion for summary judgment, the circuit court held a four-day virtual bench trial via Zoom technology in March 2021. At the close of Ashlaur's case, Levy moved for judgment in its favor pursuant to Section 2-1110 of the Code of Civil Procedure. See 735 ILCS 5/2-1110 (West 2020). The court granted the motion on counts 1 and 2 but denied it as to Count 3. When entering judgment for Levy on the first count, the court observed that Ashlaur presented no evidence that it was "an intended beneficiary" of the JV-Levy Contract. On Count 2, the court said Ashlaur could not meet its burden based on "credible evidence or reasonable inferences" from it. Instead, the court said the evidence showed the parties had a contract and acted in accordance with it.

¶ 22    As for Count 3, sounding *quantum meruit*, the court ultimately rejected Ashlaur's claim that it had provided tens of thousands of additional hours of work. The court did, however, identify 1,152 hours of extra work that benefited Levy and awarded Ashlaur $110,054 in compensation for that work. This appeal follows.

¶ 23                                    ANALYSIS

¶ 24                              I. Standard of Review

¶ 25    To begin, we first settle a dispute over our standard of review. Much of the confusion stems from the terminology used below.

¶ 26    The trial court entered what it called a "directed judgment" for Levy on these counts, and the parties refer to this as a "directed judgment" at various points in their briefs. Technically, there was no judgment to "direct" because, in a bench trial, the judge, not a jury, is the ultimate arbiter of both fact and law. *Barnes v. Michalski*, 399 Ill. App. 3d 254, 262 (2010). What really happened here was that Levy moved for a judgment in their favor at the close of plaintiff's case, pursuant to section 2-1110 of the Code of Civil Procedure, and the court granted it on counts 1 and 2. See 735 ILCS 5/2-1110 (West 2020). This process is different than when a party moves for a directed judgment at the end of a jury trial.

¶ 27    Our point is not to split hairs here; the substance of the order entered matters to our standard of review. *Barnes*, 399 Ill. App. 3d at 262. At the conclusion of the plaintiff's case in a bench trial, section 2-1110 allows the defendant to move for judgment in its favor. 735 ILCS 5/2-1110 (West 2020). In ruling on this motion, the trial court must engage in a two-part test. *Kokinis v. Kotrich*, 81 Ill. 2d 151, 155 (1980).

¶ 28    First, the court must determine if, as a matter of law, the plaintiff has presented a *prima facie* case by offering at least some evidence on every element of the underlying claim. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). The court does not weigh conflicting evidence or pass judgment on the witnesses' credibility. Rather, it looks to see if there is a total lack of evidence on one or more elements of the plaintiff's claim. *Barnes*, 399 Ill. App. 3d at 264. If so, the plaintiff has not made a *prima facie* case, and the court should enter judgment for the defendant. *People ex rel. Sherman*, 203 Ill. 2d at 275. Whether the plaintiff has failed to present a *prima facie* case is a question of law, so our review of the court's decision at this stage would be *de novo*. *Id.*

¶ 29    If, however, the trial court determines that the plaintiff has presented a *prima facie* case,

it moves to the second phase. Here, in its role as finder of fact, the court must consider and weigh the totality of the evidence already presented, including any evidence favorable to the defendant. *Id.* at 275-76. Unlike a motion for a directed verdict in a jury trial (cf. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494 (1967)), the court does not view the evidence in the light most favorable to the nonmoving party. *Sherman*, 203 Ill. 2d at 276. Instead, the court must weigh all the evidence, determine the credibility of the witnesses, and draw reasonable inferences before determining if the plaintiff has met its ultimate burden. *Id.*

¶ 30    In essence, the second part of the *Kokinis* test absolves the defendant from having to put on a defense if the plaintiff cannot possibly prevail. *Barnes*, 399 Ill. App. 3d at 264 ("If the plaintiff's evidence is unconvincing as it stands, even without the presentation of any evidence by the defendant, it should grant the defendant's motion for judgment.") Because this prong requires the circuit court to make credibility determinations, we will not reverse this ruling unless it is against the manifest weight of the evidence. *Kokinis*, 81 Ill. 2d at 154.

¶ 31    Ashlaur seeks a *de novo* review of the judgments on counts 1 and 2. Levy says the manifest-weight standard applies in each instance. We must look at what the trial court said when announcing its judgment.

¶ 32    On count 1, the court found that, even before measuring the credibility of the evidence, Ashlaur had not presented a *prima facie* case, which would suggest that our review on this count is *de novo*. But the court went a step further and also concluded that, even when considering the credibility of the witnesses and evidence, there was insufficient evidence that Ashlaur was an intended third-party beneficiary. So that factual finding would be reviewed under the manifest-weight standard.

¶ 33    As to count 2, the court concluded that Ashlaur could not meet its burden to prove Levy

breached the contract "based on credible evidence or reasonable inferences" from it. Because the court made factual findings and credibility determinations on both Counts 1 and 2, we will not reverse its factual findings unless its conclusion was against the manifest weight of the evidence. *Kokinis*, 81 Ill. 2d at 154. But to the extent we are called upon to construe the language of a contract, our review is *de novo*, as the construction of a contract is a question of law. *Bank of Ravenswood v. Polan*, 256 Ill. App. 3d 470, 474 (1993).

¶ 34    Finally, we would add that, as to each and every count, we may affirm the trial court's judgment on any basis in the record, even if it was not a basis on which the trial court relied, and even if we find fault with the trial court's reasoning. *People v. Johnson*, 208 Ill. 2d 118, 129 (2003); *Village of Belle Rive v. Illinois Central R.R. Co.*, 2018 IL App (5th) 170036, ¶ 9. We may do so because we are considering the correctness of the judgment, not the reasoning on which that judgment was reached. *Johnson*, 208 Ill. 2d at 129; *Village of Belle Rive*, 2018 IL App (5th) 170036, ¶ 9.

¶ 35             II.  Breach of JV-Levy Contract (Third-Party Beneficiary Claim)

¶ 36    We turn to Ashlaur's claim that it is entitled to damages for breach of the contract between the Joint Venture and Levy (the JV-Levy contract). Though Ashlaur was obviously not a party to that contract, Ashlaur claims it was an intended third-party beneficiary of that contract.

¶ 37    Under Illinois law, if two parties contract for the direct benefit of a third party, that third party is deemed an intended beneficiary who may sue for breach of that contract. *Carson Pirie Scott & Co. v Parrett*, 346 Ill. 252, 257 (1931); *XL Disposal Corp. v. John Sexton Contractors Co.*, 168 Ill. 2d 355, 361 (1995). The law presumes that only the signatories to the contract are parties to that contract; there is a strong presumption against finding that a third party is an intended beneficiary. See *155 Harbor Drive Condo. Ass'n v. Harbor Point, Inc.*, 209 Ill. App. 3d

631, 647 (1991).

¶ 38    The JV-Levy contract required that 50% of the work that Levy subcontracted be performed by an MBE, which in this case was Ashlaur. In Ashlaur's view, that means Ashlaur was an intended third-party beneficiary of that contract. But even if Ashlaur is correct, that only gets it halfway to a ruling in its favor on this claim. That is, even if Ashlaur were a third-party beneficiary, Ashlaur must still persuade us that it proved a breach of the JV-Levy contract. Ashlaur still must prove the existence of a valid contract, performance by the plaintiff, a breach of that contract, and damages naturally resulting from the breach. *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 28. And while Ashlaur goes to great lengths to convince us of its status as a third-party beneficiary, it provides almost no support in its briefs for the proposition that it proved a breach of the JV-Levy contract.

¶ 39    Ashlaur's theory of breach of the JV-Levy contract is as follows: that contract called for payment to Levy in the sum of $12,685,000 (not including later amendments or change orders); the contract mandated participation by an MBE (here, Ashaur) in the amount of 50% of that number; thus, Ashlaur was entitled to a contract valued at $6.34 million, half of what Levy total was to receive in total.

¶ 40    Levy would say that Ashlaur got exactly that. Ashlaur's contract with Levy, in rough numbers, was for that very amount—$6.34 million. That number was broken down into two calculations, one for the cost of materials and Ashlaur's hiring of an insulation-installation subcontractor ($3.428 million), the other for labor ($2.915 million). The first of those calculations included a $125,000 payment to Ashlaur as a "service fee" for the administrative work in helping purchase materials, what Levy characterizes as Ashlaur's "profit" for the purchase of materials.

¶ 41    The gravamen of Ashlaur's breach claim is that the $3.428 million in materials cost (and the hiring of a subcontractor to install insulation) should not be included in the overall requirement that it receive $6.34 million from the contract. Though Ashlaur does not elaborate in much detail, the point seems to be that there is no profit in the materials or in the hiring of the insulation installer, so it should not count towards the overall $6.34 million Ashlaur was supposed to receive.

¶ 42    Instead, says Ashlaur, the only payments that should be creditable against the 50% MBE requirement is the "substantive" work it performed, approximately $3 million in labor costs. Thus, in Ashlaur's view, it is now entitled to the difference between what the JV-Levy contract promised Ashlaur would receive ($6.34 million) and what it received for its labor (essentially $3 million)—Ashlaur is entitled to recovery of about $3.4 million.

¶ 43    That may or may not be a meritorious position, but it is certainly not intuitive or obvious. Nothing in a contract is pure profit, after all. Labor costs, which even Ashlaur concedes are creditable toward the MBE requirement, certainly are not. Ashlaur paid salaries to its employees to perform work on the project, and Levy paid Ashlaur (presumably) more than that for the work. So Ashlaur turned a profit, but not every dollar received for labor costs from Levy was profit to Ashlaur—Ashlaur made a *net* profit, the money left over after deducting what Ashlaur had to pay its workers to perform the work.

¶ 44    Yet Ashlaur apparently would be comfortable crediting all $3 million to the MBE requirement, even though not all of it was profit. But then how is the materials cost any different? The way Ashlaur made a profit on materials under its contract with Levy was the "service fee" paid to Ashlaur for the administrative work necessary to purchase those materials and pay the insulation subcontractor. Levy paid or reimbursed Ashlaur for the cost of the

materials, and Ashlaur received a $125,000 "service fee" for the administration involved in that purchase. Though styled differently, the result is essentially the same: Levy covered the costs of materials and reimbursed Ashlaur for the cost of the insulation subcontractor but then added a service fee, the service fee being Ashlaur's net profit. So it is not obvious to us that the materials and installation-subcontractor portion of Ashlaur's contract should, for some reason, be treated differently than the labor portion; each side involves a cost incurred by Ashlaur that is reimbursable and (presumably) a net profit for Ashlaur beyond those costs.

¶ 45    Indeed, the JV-Levy contract, under which Ashlaur attempts to bring this claim as a third-party beneficiary, was no different. As already noted, the total contract amount (before amendments and changes) was $12,685,000, but surely nobody would claim that this was pure profit for Levy. Nor was it only labor costs. At a minimum, we know it included the cost of hiring an MBE subcontractor, Ashlaur, along with the materials associated with the MBE's work. In other words, Levy was supposed to pay half this total amount ($6.34 million) to its subcontractor and for related materials. That is no different a cost to Levy as the cost of hiring an installation installer was to Ashlaur. So if the total contract award, on which Ashlaur is laying its claim to half, included not only labor but also costs of subcontractors and materials, why would Ashlaur's half only include labor and *exclude* those other costs?

¶ 46    And one final problem we would identify at the outset relates to the issue of damages, and it may be the biggest problem. Ashlaur is claiming that the cost of materials and hiring an insulation installer should be excluded, and only labor costs should be counted against the $6.34 million requirement. Even if Ashlaur is correct, its damages theory is somewhat remarkable: Ashlaur is claiming that it is thus entitled to every single dollar that makes up the difference between the $6.34 million total MBE contract award, on the one hand, and the roughly $3

million it received for labor, on the other—about $3.4 million, *regardless of what work Ashlaur did or did not perform on the project*. Just write a check for the difference, full stop, without regard to what work Ashlaur actually performed? That would result in a significant windfall for Ashlaur—at the expense of the taxpayer dollars funding this public-works project. At least at first blush, that does not strike us as remotely logical or valid.

¶ 47   In raising these initial concerns, our point is not to portray ourselves as experts in construction law and certainly not to conclusively resolve the matter. Rather, we make these points to demonstrate that Ashlaur's position is not immediately obvious to us, nor at first blush is it even intuitive or logical. So we would expect that Ashlaur would present us with case law and argument to put a finer point on its position.

¶ 48   But Ashlaur does not cite any case law to support its interpretation. Not a single decision, from Illinois or elsewhere, for the proposition that a total contract award excludes materials and other costs and includes *only* labor costs. The argument section of its opening brief consists of only a single paragraph on the question of breach and how Ashlaur calculates its damages, much as we have summarized above: "Levy's purchase of insulation installation and materials through Ashlaur, while permissible, were not creditable toward MBE inclusion under the unambiguous terms of Appendix A [of the JV-Levy contract]. Thus, Ashlaur received only $3M in value, whereas it should have received over $6M (half of the value of the Levy Contract)."

¶ 49   Ashlaur's only support for its position is its references to provisions in Appendix A of the JV-Levy contract. But these citations do not support its argument.

¶ 50   For one, Ashlaur cites a provision in Appendix A that states: "Credit toward MBE/WBE commitments is only given for work by firms performing within their Area(s) of Specialty as stated in the current letter of certification." That strikes us as a garden-variety requirement that

an MBE must have expertise in the particular specialty needed and cannot be hired *solely* based on its status as an MBE. That language gives us no insight into the question before us.

¶ 51    Ashlaur also cites the following language from Appendix A:

"Only payments to firms performing Commercially Useful Functions under the Project contract are counted towards MBE/WBE goals. Commercially Useful Functions include actually performing, managing, and supervising a clear element of the contract. The amount of work subcontracted, industry practices, and other relevant factors are considered."

¶ 52    That language, similar to the language above, requires that the MBE actually perform work that contributes to the project, including "performing, managing, and supervising a clear element of the contract." Again, this language does not persuade us that passing through the cost of a subcontractor, like the installation installer Ashlaur hired, would not qualify under this standard, nor that the cost of purchasing materials could not be passed through. Nothing in this language suggests that only labor costs may be considered toward the MBE goal.

¶ 53    To the contrary, Appendix A openly contemplates that the MBE might itself hire subcontractors, explicitly *permitting* that practice as long as it does not become too big a part of the project: "A MBE/WBE subcontractor is presumed not to perform a Commercially Useful Function when it subcontracts a significantly greater part of the contract than customary industry practice permits." That language obviously contemplates that the MBE will hire a subcontractor. This language would make no sense in Appendix A if the JV-Levy contract did not anticipate that the WBE would be passing through costs of another subcontractor as part of its contract price.

¶ 54    Absent any case law or analysis explaining how these provisions carry the day for its

position, we cannot grant relief to Ashlaur. It is the appellant's burden to demonstrate that error occurred below with pertinent authority and argument; it is not our duty to search for reasons to reverse a judgment. *Fairwell Construction Co. v. Tickin*, 84 Ill. App. 3d 791, 801 (1980); *Thrall Car Mfg. Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). As we have been provided no basis to find a breach of the JV-Levy contract, we need not determine whether Ashlaur was an intended third-party beneficiary of that contract. We thus affirm the court's judgment as to count 1 of the complaint.

¶ 55                      III.  Breach of Levy-Ashlaur Contract

¶ 56    Ashlaur next argues that it proved a breach of its own contract with Levy, as it proved that Levy failed to pay Ashlaur for extra, out-of-sequence work on the project. Recall that the JV-Levy contract anticipated that the drywall in the guest rooms would be hung in the guest rooms in two sequences. However, Ashlaur presented some evidence—which Levy did not rebut—that it had to work on various floors out of sequence or return multiple times to finish the job. This "extra-sequential" or "out-of-sequence" work, according to the August 14, 2017, letter from Ashlaur's president, Zollie Carradine, consumed 15,000 additional labor-hours of work that Ashlaur did not budget in the initial contract. Now, Ashlaur wants to be paid for that work, which it calculates at $1.4 million (15,000 hours times the hourly rate of $98).

¶ 57    There are problems with Ashlaur's argument. First, we consider Ashlaur's claim as a whole, embodied in its August 14 letter. In that letter, Ashlaur summarized its claim as follows:

> "The contract amount *** was for three million ($3,000,000.00) which represents approximately thirty two (32,000) thousand-man hours. However, we have completed a total of forty-seven (47,000) thousand-man hours. Leaving a project labor overage of fifteen (15) thousand-man hours."

¶ 58    The problem with Ashlaur's position, however, is that the Levy-Ashlaur contract calculated the payment for Ashlaur's labor based on the square footage of drywall to be taped and hung, *not* on the number of labor-hours it would take. The contract plainly stated that "hanging and taping square footages that are enclosed are the basis for the agreed upon contract price." Ashlaur may have internally calculated the amount of labor at 32,000 man-hours—the parties may have even so calculated—but the contract did not, and the contract controls. If the job took longer than expected, that was a risk Ashlaur assumed. Even Ashlaur's president conceded as much at trial. A contractor is not entitled to additional compensation simply because the task it undertakes turns out to be more difficult or time-consuming than expected. *W.H. Lyman Const. Co. v. Village of Gurnee*, 84 Ill. App. 3d 28, 32 (1980).

¶ 59    On the other hand, like most construction contracts, the Levy-Ashlaur contract allowed Ashlaur to receive additional compensation for extra work if Ashlaur encountered work that went beyond the scope of the original contract. To recover additional payment for extra work, a contractor must establish, by clear and convincing evidence, that (1) the work was outside the scope of the original contract; (2) the extra items were ordered at the direction of the superior; (3) the superior agreed either expressly or impliedly to pay extra; (4) the extra items were not voluntarily furnished by the contractor; and (5) the extra items were not rendered necessary by any fault of the contractor. *Duncan v. Cannon*, 204 Ill. App. 3d 160, 163 (1990).

¶ 60    The trial court found that Ashlaur failed to provide sufficient evidence of its right to "extras" by clear and convincing evidence. As noted, we review that factual determination under the manifest-weight standard; we will reverse that factual determination only if the opposite conclusion is clearly evident. *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 33.

¶ 61    The trial court's judgment was not against the manifest weight of the evidence; the

opposite conclusion is not clearly evident. Ashlaur offered scant evidence about the work itself. What it did offer was hardly clear and convincing evidence that it was entitled to additional payments for extra work beyond the scope of the contract. The August 14 letter and the president's trial testimony suggested that Ashlaur worked 15,000 more hours on the project than anticipated but offered no evidence about which workers performed this work, when they performed it, and what they did while working. See *Duncan*, 204 Ill. App. 3d at 163. The mere fact that the work took longer than anticipated, in and of itself, is not compensable without more.

¶ 62    Contrast that absence of documentation with the extensive documentation of the 14 extra-work orders Ashlaur properly submitted during the course of the work, each of which Levy approved. There was ample evidence of that work—including payroll records and schedules on how much of the project was complete, which reflected those extra work orders.

¶ 63    In addition, as Levy notes, every month, Ashlaur executed lien waivers that confirmed that Ashlaur did not have claims for extra work in that particular month. The trial court specifically noted this when it found for Levy on Count II. Ashlaur points out that a lien waiver only bars the right to execute a lien under the Mechanic Lien's Act, but it does not extinguish the underlying obligation to pay for the work. *Lyons Federal Trust and Sav. Bank v. Moline Nat. Bank*, 193 Ill. App. 3d 108, 113 (1990). True, but the trial court's point was not that Ashlaur was barred from relief by those lien waivers, but rather that Ashlaur's monthly attestation, that it had been adequately paid for the work it performed to date, tended to undercut its later claim that it was severely shortchanged on the project.

¶ 64    Levy raises other arguments in defense of the judgment, including that Ashlaur failed to obtain pre-approval of the additional work—to which Ashlaur responds that pre-approval had not been required for the 14 extra-work orders that Levy approved during the course of the project.

But we need not resolve that issue. Given what we have already said, we have no basis to overturn the trial court's finding that Ashlaur failed to provide clear and convincing evidence that it was entitled to extra-work compensation. We thus affirm the trial judgment on count 2.

¶ 65                              IV.  Claim for *Quantum Meruit*

¶ 66    Finally, Ashlaur sought to recover approximately $1.4 million through *quantum meruit*. Ashlaur prevailed on that claim as to liability but argues that the court awarded damages that were far too low. Levy, for its part, does not challenge the judgment on this count; it has not cross-appealed. Rather, Levy argues that we should affirm the judgment and the award that Ashlaur received. Our review of an award of damages for *quantum meruit* is once again the manifest-weight standard; we will overturn the judgment only if the opposite conclusion is clearly evident. *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 59.

¶ 67    The phrase "*quantum meruit*" means "as much as he deserves." See *Carlton at the Lake, Inc. v. Barber*, 401 Ill. App. 3d 528, 533 (2010). *Quantum meruit* allows a plaintiff to recover if it can prove that it furnished valuable material or services to the defendant under circumstances that would make it unjust for the defendant to retain the benefit without compensation. *Hayes Mechanical, Inc. v. First Industries, L.P.*, 351 Ill. App. 3d 1, 9 (2004). A plaintiff must prove its performance of services, the conferral of a benefit on the defendant from those services, and the unjustness of the defendant retaining that benefit without compensation. *Barber*, 401 Ill. App. 3d at 534. The plaintiff need not prove the exact amount of its loss but must "provide a basis for assessing damages with a 'fair degree of probability.'" *Ahmed*, 2018 IL App (1st) 171534, ¶ 64 (quoting *Benford v. Everett Commons, LLC*, 2014 IL App (1st) 130314, ¶ 30).

¶ 68    As the circuit court noted, Ashlaur's theory of damages for its *quantum meruit* claim in count 3 is the same as its claim for contractual damages for extra work under count 2. Again, in

its August 14 letter, Ashlaur claimed that it estimated the amount of work as consuming 32,000 labor hours, when in fact it totaled 47,000 hours, and thus it was entitled to $1.4 million. Ashlaur repeats on appeal that its relief under *quantum meruit* should be the same as its contractual damages claim, and the trial court erred in finding otherwise.

¶ 69 But the legal theories are altogether different. Contract damages are fixed by the parties, while *quantum meruit* damages are fixed in law, based on principles of equity and justice. See *id.* at 533; *Comm v. Goodman*, 6 Ill. App. 3d 847, 855 (1972). And in any event, the trial court rejected Ashlaur's theory of damages as to count 3 for much the same reason it did as to count 2—that Ashlaur failed to provide sufficient evidence, under either theory, that it was entitled to the amount of money it claimed.

¶ 70 Though the court noted that it was struggling with the proof presented on *any* calculation for damages under any theory, the court ultimately concluded that it could find some specifics in the testimony and in Ashlaur's email dated August 11, 2017, as well as the August 14, 2017 letter we have discussed above. That detail specified that Ashlaur spent 1,120 extra hours hanging and taping "elevator clouds" and an additional 32 hours of hanging and taping in the "presidential units." The court then added up those hours (1,152), multiplied it by the hourly rate per worker ($98), and came up with a number.

¶ 71 We have no basis for finding error in the trial court's reasoning. We certainly could not say that the opposite conclusion is clearly evident, when Ashlaur did not provide any further specifics beyond what the trial court noted.

¶ 72 Our only quarrel is with the circuit court's math. The court computed a damages award of $110,054, based on hours times the $98 hourly rate. Our math says that 1,152 times 98 is $112,896. It seems that the trial court was using the wrong number of hours (1,123) to reach its

figure. The record is crystal clear, however, that the court meant to add the sums of 1,120 (for the elevator clouds) and 32 (presidential units), which is 1,152 hours.

¶ 73    So we affirm the judgment on count 3 but modify the award of damages to the amount of $112,896.

¶ 74                                    CONCLUSION

¶ 75    We affirm the trial court judgment on counts 1 and 2. We affirm the judgment in favor of plaintiff on count 3 but modify the damages award to $112,896.

¶ 76    Affirmed as modified.